MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
THOMAS B. RUPP (CSBN 278041)
219 9th Street
San Francisco, California 94103
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

Proposed Attorneys for DEBTOR

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re<br><br>DEERFIELD RANCH WINERY, LLC,<br><br>Debtor. | Case No. 15-10150-AJ<br><br>Chapter 11<br><br>**MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL**<br><br>Judge: Hon. Alan Jaroslovsky<br>Date: TBD<br>Time: TBD<br>Place: United States Bankruptcy Court<br>99 South "E" Street<br>Santa Rosa, CA 95404 |

## I. INTRODUCTION

Deerfield Ranch Winery, LLC, the debtor-in-possession in the above-captioned Chapter 11 reorganization case ("Deerfield" or the "Debtor"), hereby moves for an order authorizing Deerfield to use cash collateral in the ordinary course of its business (the "Cash Collateral Motion").

This Cash Collateral Motion is based on the memorandum of points and authorities set forth herein, the DECLARATION OF ROBERT REX IN SUPPORT OF FIRST DAY MOTIONS (the "Omnibus Declaration") filed concurrently herewith, the pleadings and papers on file herein, and upon such additional evidence as may be presented at the hearing on this Cash Collateral Motion.

Rabobank N.A., Deerfield's primary secured lender ("Rabobank") asserts that it holds a duly perfected security interest in substantially all of Deerfield's assets, including its cash, to secure an obligation that is currently approximately $10,914,586.77 million. Deerfield does not believe that any other creditor holds an interest in cash collateral.

Deerfield seeks authorization to use cash collateral as necessary in the ordinary course of the operation of its business. Deerfield is a respected and successful operating winery located in the Sonoma Valley. As an operating winery, Deerfield requires use of its cash on a continual basis in order to pay its employees and pay other routine expenses in the ordinary course.

On an emergency interim basis, pending final relief, Deerfield seeks relief to disburse approximately $249,224 during the next four weeks. During this four week period, Deerfield projects that its net cash will decrease by approximately $45,013, but increase substantially through week seven. Deerfield also seeks final relief granting it the right to use cash collateral on an ongoing basis in the ordinary course of its business, consistent with its 13-week cash flow budget, as updated from time to time (the "Budget").

Deerfield submits that Rabobank is protected by an equity cushion of not less than $5 million, or 45%, even using depressed liquidation values. Applying a realistic going concern value, the equity cushion is much greater. Deerfield further submits that Rabobank is protected by the preservation of going concern value, and expected increase in overall cash position, that results from maintaining operations. Nevertheless, Deerfield proposes to also provide Rabobank with a replacement lien in post-petition assets, of the same nature, extent, and validity as its existing pre-petition lien. Based on these forms of adequate protection, no cash adequate protection payments should be required.

## II. JURISDICTION

On February 13, 2015 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United Stated Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California.

The Court has jurisdiction over this case and this Cash Collateral Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

The statutory bases for the relief requested herein are §§ 105(a) and 363 of the Bankruptcy Code, and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

### III. FACTS

**A.  Background of Deerfield**

Deerfield Ranch Winery is an award-winning winery located in the heart of the Sonoma Valley, founded by Robert and PJ Rex. Specializing in blended wines, Deerfield's winemakers carefully craft some 20 different wines in small lots from specially selected Sonoma vineyards. Annual production totals approximately 30,000 cases annually, including both Deerfield brands and the winery's substantial custom-crush business, which includes 12 small family-owned wineries. Although issues with Deerfield's secured lender have necessitated this filing, the winery operations are strong, profitable, and growing.

Deerfield Ranch Winery was founded in 1982, when the Rexes moved to their home, which was the original Deerfield Ranch Winery and is located on the ridge above the current winery. The Rexes began selling wine under the "Deerfield" name in 1984. Deerfield Ranch Winery LLC was formed in 1999. The winery LLC is owned by 87 members, who have contributed more than $15 million to the business.

The Deerfield estate is approximately 47 acres, located in Kenwood, California, and was acquired in 2000. Approximately 7 acres are planted in biodynamically farmed vineyards. After Deerfield purchased the property, it constructed a 23,000 square foot wine cave with a capacity for 2,500 barrels and a grand tasting room in the center, as well as a state of the art production facility. *In total, Deerfield and its members invested $15.9 million in the real property and improvements.*

Production at the new winery began with the 2005 harvest, and the winery opened to the public in 2008. Since the winery opened, revenues and gross profits have generally improved

from year to year. During the same period, Deerfield Ranch Winery has grown from the two founders to 22 employees supporting numerous families.

Deerfield owes approximately $10.9 million to Rabobank on two loans taken out in late 2008. The value of the business far exceeds the amount of the loans, meaning that unsecured creditors are in a position to receive payment in full, and that there should be substantial recovery to be preserved for equity.

A fuller presentation of Deerfield's background, the circumstances which led to the instant Chapter 11 filing, and Deerfield's expectations regarding its reorganization is set forth in the Omnibus Declaration in support of First Day Motions.

**B.      The Rabobank Loans**

10.     The cost of construction was funded in part through the sale of member equity, various bridge loans, loans from members, and construction loans. In 2007, Deerfield approached Rabobank and was told, after Rabobank conducted months of due diligence, that Deerfield qualified for an $11 million fully amortized term loan to refinance and consolidate the various loans that had financed construction. When Deerfield's managers received the initial loan documents back from Rabobank at the end of 2008, they were informed that Rabobank would only provide an $8 million term loan, because of the dramatic downturn in the market. This was in late 2008, in the early stages of the Great Recession, when the banking system was on the verge of collapse and the credit market had virtually dried up. Rabobank offered to provide the other $3 million in the form of a line of credit, secured by Deerfield's inventory and accounts receivable borrowing base, which would come due in 2010. Deerfield expressed concern about these terms, because it would be impossible for Deerfield to repay the $3 million line of credit in 15 months. Deerfield was assured by Rabobank that the bank would roll the $3 million line of credit into the term loan when it became due in 2010. When the line of credit came due, however, Rabobank refused to do this.

It was the understanding of Deerfield management that the $8 million term loan was amortized, after a short interest-only period, with monthly principal and interest payments over its 7-year term. This was what the managers were told by Rabobank, and nothing in the initial

documents indicated otherwise. Deerfield's management did not understand there to be any annual balloon payments. Instead, they understood that the monthly payments were for the amortized amount. As required by Rabobank, the loan documents were reviewed by the accounting firm of Moss Adams. The Moss Adams review did not reflect that the loans required anything other than regular monthly payments.

During the first year of the Rabobank loans, Deerfield made all payments in a timely fashion. In January 2010, however, Deerfield was informed that Rabobank was demanding an annual principal payment of $206,000 on the $8 million term loan. Deerfield had understood the term loan to not require any balloon principal payments prior to its maturity. In response to Deerfield's inquiry, Rabobank provided a "Schedule of Principal Payments of Term Loans," showing annual principal payments due on December 1 of each year, starting in 2009. Deerfield management had never seen this document before, nor had the accounting firm that reviewed the loan files, Moss Adams. This is supported by the fact that the original review by Moss Adams had a note reflecting that the repayment schedule for the $8 million term loan was "interest only payments until December 1, 2009; monthly payments of principal and interest thereafter."

Because the winery could not support these large principal pay-downs, Deerfield management sought a modification of the loans to amortize the principal pay-downs. This would have allowed Deerfield to meet its obligations without default. Despite the efforts of Deerfield management to address the situation in a responsible manner, Rabobank refused to amortize the principal payments, and instead threatened foreclosure, despite the fact that Deerfield had made its monthly payments consistently and without fail.

Under duress, Deerfield was forced to accept Rabobank's amendment, which simply delayed the date of the balloon payment, and actually accelerated the due date of the line of credit from August to April 2010. Over the next four years, Deerfield was forced to sign multiple further amendments, each time extending the due date of the line of credit by only a few months. Although Deerfield made substantial principal pay-downs, the modifications that Rabobank required ultimately consolidated multiple balloon payments into one massive payment of $567,000, followed by a pay-off of the $3,000,000 line of credit three months later. Deerfield

could not hope to pay these amounts on this schedule. Inevitably, Deerfield was unable to make this unreasonable payment of $567,000 on December 31, 2013, and the $3,000,000 line of credit due March 31, 2014. Rabobank then filed a judicial foreclosure action in February 2014 (the "Foreclosure Action").

During the entire five years the loans were outstanding, prior to Rabobank filing the Foreclosure Action in February 2014, Deerfield consistently and without fail made its regular monthly payments. These payments totaled approximately $43,000 per month for the two loans and the costly interest rate swap agreement required by Rabobank. Deerfield continued making these payments reliably throughout the course of the loans, until Rabobank halted the ACH for the term loan and the line of credit withdrawals starting in January 2014. Rabobank continued to withdraw interest swap payments on January 2, 2014 in the amount of $14,351, and on February 2, 2014 in the amount of $14,805. Even after Rabobank filed its foreclosure action on February 10, 2014, Deerfield continued to make interest payments, paying more than $360,000 in 2014. The loans were assigned to Rabobank's Special Assets group in April 2010. Being assigned to Special Assets resulted in substantial fees, in addition to the regular monthly payments, which Deerfield continued to make.

While Deerfield's management feels that it was substantially misled by Rabobank in connection with the terms of the loans, Deerfield acknowledges that any claims based on this were most likely released in subsequent amendments. Deerfield presently has no intentions of pursuing any action against the bank, and believes that the focus should be on how to restructure these substantially oversecured loans.

Over the past five years, Deerfield has paid more than $275,000 in fees levied in connection with modifications to extend the due date of the line of credit, and other Special Assets requirements. Deerfield also made more than $325,000 in principal payments on the term loan during this time, in addition to the regular monthly payments on both loans. *In sum, over the five years and two months between the funding of the loans and Rabobank filing a foreclosure action, Deerfield paid Rabobank more than $4.1 million on these loans totaling $11 million.*

## C. Deerfield's Current Operations

Deerfield is a highly respected, profitable business with a very high likelihood of a successful reorganization, despite its troubles with the Rabobank loans. After opening to the public in 2008, the winery business has grown steadily despite being hampered by the banking relationship. Deerfield has been profitable in 2012 and 2013, even after debt service, including the substantial annual payments made that were required by Rabobank. Net profit was $100,000 on $3.1 million in revenue in 2012, $125,000 on $3.4 million in 2013. During these past three years EBITDA has been $972,000 in 2012, $1.2 million in 2013, and $767,000 in 2014. Even with the debt service and the punishing additional expenses associated with being assigned to Special Assets, Deerfield has had a generally positive bottom line. Without the $84,687 in extraordinary costs associated with the foreclosure action and receivership in 2014, adjusted EBITDA was $850,000, meaning that net profit would have been $77,000 without these extraordinary costs.

Deerfield's business and operations are more fully described in the Omnibus declaration. In addition to production and sale of Deerfield Ranch Winery brand wine, the business also includes production and sale of wine under Deerfield's second Deerfield@Wine brand, a substantial custom crush business, and routine sale of excess bulk wine.

Deerfield has continued to pay its vendors in the ordinary course of business in spite of its struggles with Rabobank. As a result, Deerfield's unsecured debt is only the routine accounts that are to be expected for a winery at this point in the year. Deerfield's only other substantial debt is a Sonoma County property tax lien, in the principal amount of $565,800, with accrued interest of approximately $189,000. When Deerfield was forced to make large principal payments to Rabobank, the only way that it could make these payments without jeopardizing operations was to use funds that otherwise would have gone to pay real property taxes.

The Budget illustrates Deerfield's expected cash flows over the thirteen weeks beginning February 9, 2015. Starting cash position on February 9 was approximately $195,000. Over the Budget period, this is expected to increase to $325,886. A substantial part of this positive net cash flow comes from the wine club shipment scheduled for the week of March 23, 2015.

### D. Intended Reorganization

Deerfield believes that any attempt sell the business in the immediate term would result in depressed offers that do not reflect the actual value of the business. While Deerfield is amenable to exploring a sale if it appears that an appropriate value can be realized for the benefit of all of its constituencies, it is probable that a reorganization process is more likely to protect the rights of all of Deerfield's creditors *and* equity holders.

Deerfield therefore expects to promptly propose a plan of reorganization, which restructures its debt so that it can operate successfully for some period, perhaps five years. Within that time, the company would expect to sell the business or refinance the debt. The plan of reorganization will most likely contemplate extending the Rabobank debt for a period of time, at a reasonable interest rate that is fair to both the bank and other creditors/ equity holders. Reorganization of the Rabobank loans into a long-term, fully amortized note or notes is also a possibility. In either case, Deerfield expects that it will be able to propose a plan that pays unsecured creditors in full, over time, allowing equity to remain in place.

### E. Proposed Use of Cash

Attached to the Omnibus Declaration as Exhibit A is Deerfield's Budget, which describes Deerfield's current expectations for its use of cash through the middle of May 2015. While there are some fluctuations, consistent with the ordinary course of Deerfield's business at this point in the yearly cycle, the Budget reflects no material net change over the term of the Budget period.

It may be necessary to modify the Budget from time to time based on business developments and in response to any concerns raised by parties.

## IV. RELIEF REQUESTED

### A. Interim Relief

Deerfield requests authorization for emergency use of cash collateral on an interim basis, until a final hearing can be held on this Cash Collateral Motion. Pending the final hearing, Deerfield seeks permission to use cash to sustain its business, consistent with the Budget. As set

forth in the Budget, this will involve expenditures of approximately $233,136 over the next four weeks.

Pursuant to Rule 4001(b), a final hearing can be held no earlier than 14 days after the service of this Cash Collateral Motion. Therefore, Deerfield expects that interim relief will be required for approximately three to four weeks, depending on the Court's availability for a final hearing.

**B.     Final Relief**

Deerfield requests that it be authorized to expend cash in the ordinary course of its business, and consistent with its Budget, subject to any revisions and extensions of the Budget that may occur from time to time.

**C.     Adequate Protection**

Deerfield proposes to provide adequate protection to Rabobank for Deerfield's use of cash collateral as follows.

Rabobank is adequately protected by a substantial equity cushion. Even based on the minimum possible assumptions of value, the equity cushion is more than $5 million. This is the most significant adequate protection available to Rabobank.

Rabobank is provided additional adequate protection through Deerfield's continued operation of the business. Deerfield is worth substantially more as a going concern business than in liquidation. Rabobank is therefore protected by the ongoing operations of the business.

Since there is no anticipated diminution in the collateral base, and in fact the collateral base will be enhanced, Deerfield believes that the foregoing adequately protects Rabobank's interests.

Nonetheless, as a further form of adequate protection, Deerfield is willing to provide a replacement lien in order to secure any diminution in Rabobank's collateral. The replacement lien would be against Deerfield's post-petition assets (other than rights arising under Chapter 5), with the same nature, extent, validity, and enforceability as its pre-petition lien.

Based on the above, Deerfield submits that Rabobank's interests are adequately protected. Deerfield should therefore be permitted to freely use its cash, including cash collateral, in the

ordinary course of its business, and for such other uses as may be approved by the Court in the future.

A copy of the proposed Cash Collateral Order is attached hereto as **Exhibit A**.

### V. BASIS FOR RELIEF REQUESTED

Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral ... unless:
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

Thus, use of cash collateral may be based on either consent of the secured creditor, or the Court's authorization even in the absence of consent. The secured creditor is protected in that the court may prohibit or condition such use "as is necessary to provide adequate protection" for the interest of the secured creditor. *See* 11 U.S.C. § 363(e). The burden of proof respecting the existence of adequate protection is on the moving party. 11 U.S.C. § 363(p)(1).

Pursuant to § 363, this Court may authorize Deerfield to use the cash collateral. Deerfield's use of cash collateral may, however, be conditioned on the Court determining that the interest of Rabobank is being adequate protected. *See* In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988).

**A. Extent of Cash Collateral**

Deerfield has not had the opportunity to conduct a thorough review and analysis of the Rabobank loans and security interest. It appears, however, that Rabobank holds a duly perfected security interest in substantially all of Deerfield's assets. Deerfield therefore does not presently dispute that Rabobank has "cash collateral" rights with respect to most of Deerfield's cash and revenues. For the purposes of this Cash Collateral Motion only, Deerfield therefore does not dispute the validity or enforceability of Rabobank's lien.

Given that Deerfield believes that its estate is solvent, and that Rabobank holds the majority of all of its debt, there would be no purpose served by searching for issues with Rabobank's security interests at this early stage. At the same time, it would be inappropriate for Deerfield to attempt to bind its estate to any resolution of these issues. For these reasons, Deerfield submits that any relief granted to it or to Rabobank in connection with this Cash Collateral Motion be without prejudice to any future consideration of the Rabobank loans and related security interests.

**B.     The Bank's Right to Adequate Protection**

The secured creditor's right to adequate protection is simply a right to be protected from a post-petition diminution in the value of the creditor's collateral. The legal standard governing a secured creditor's interest in collateral was established by the Supreme Court in the case United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988). The "interest in Property" of a secured creditor is limited to the "value of the collateral." Timbers of Inwood, 484 U.S. at 372. The adequate protection provisions of the Bankruptcy Code thus protect a secured creditor only from a potential diminution in the value of that creditor's collateral during the post-petition period. Id.

The courts have consistently held that where there is no diminution in the value of the collateral, there is no need for additional adequate protection, including adequate protection payments. The following holding from the Central District Bankruptcy Court is illustrative:

> [T]he Court finds that the property is not depreciating in value. In consequence, the Court finds that Lomas [Secured Creditor] is adequately protected by the value of its collateral . . . The right to receive payments is a simple contract right, that supports only a claim in the bankruptcy case. There is no other adequate protection to which Lomas is entitled under the Bankruptcy Code.

In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988); *see also, e.g.*, In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to adequate protection payments); In

re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured creditor was required to show a necessity for adequate protection by demonstrating a decline in asset value from the petition date); In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under Timbers, movants are not entitled to adequate protection payments, as there was no showing that property was depreciating in value).

**C.      Provision of Adequate Protection**

To the extent that there is an obligation to provide adequate protection, Deerfield proposes to do so in two ways.

      1.      *Rabobank is Adequately Protected by a Substantial Equity Cushion*

First, an equity cushion is routinely considered a form of adequate protection. Under any review of the circumstances, it is abundantly clear that Rabobank enjoys an enormous equity cushion.

Deerfield believes that a realistic value for its assets and business is between $25 and $35 million, suggesting that Rabobank is protected by an equity cushion in excess of 100%. Approximately $15.9 million was invested the land and improvements, including the wine cave, the roadways, the production facility, and the left turn lane off of Highway 12. Land values in Sonoma have also increased substantially since 2000. Deerfield's inventory has a value, through ordinary course sales channels, in excess of $7.4 million. There is substantial additional value in equipment, barrels, IP, and other assets. Deerfield also has a vested permit from the county of Sonoma to build a larger 17,000 sq. ft. winery and public building on the property. This vested permit is of substantial value, given the extreme difficulty of obtaining new winery permits in the Sonoma Valley.

While Deerfield believes the value of the business is at least $25 to $35 million, a determination of the actual value is not necessary at this stage. Deerfield should be permitted to use its cash in order to operate its business because even the most conservative liquidation valuation indicates that the collateral securing Rabobank's liens substantially exceeds the amount of the loans. Attached to the Omnibus Declaration as Exhibit B is a chart showing a liquidation value floor for the value of Rabobank's collateral, based on using Rabobank's own methodologies and appraisals, and extremely conservative liquidation values (the "Collateral Chart"). This chart

is not intended to represent the real value of Deerfield or its assets. It simply shows that there is no reasonable calculation under which Rabobank does not have a substantial equity cushion, as discussed in more detail below.

Deerfield has not had the opportunity to obtain its own professional appraisal of its real property. Rabobank has, however, conducted multiple appraisals over the course of the loan. In February 2012, Rabobank had an appraisal prepared by the very respected firm of Correia-Xavier, Inc. (the "2012 Rabobank Appraisal"). This 2012 Rabobank Appraisal indicated a value of $11,400,000 for the real property. This appraisal, done during the Great Recession, compares to a 2008 appraisal, also prepared at the bank's request, which showed a value, before the winery improvements were completed and the winery was open to the public, of $14.5 million.

That the 2012 Rabobank Appraisal presents a floor is further supported by the most recent report from the receiver appointed by the bank, for the month of January 2015. The receiver's report provides information on the estimates of value for the real property provided by brokers considered by the receiver, and states that "a range of values was suggested, from approximately $11 Million to $18 Million, with both groups feeling that a mid-range value of $15 Million + was attainable." Deerfield believes that this is a very conservative range, driven by the depressed market created in a receivership sale.

The 2012 Rabobank Appraisal presents an absolute floor for the real property value. It is well known and universally accepted that real estate values in Sonoma County, and in particular in the Sonoma Valley, have steadily increased through 2012, 2013, and 2014.

Rabobank is also secured by Deerfield's substantial wine inventory, including both bulk wine and case goods. The market value of this inventory is at least $7.4 million, if sold in the ordinary course of Deerfield's business, applying Deerfield's usual allocation of distributor, wholesale, and retail sales. Even applying Rabobank's extremely conservative borrowing base methodology, which is designed to provide a minimum liquidation value, the inventory represents an additional $4.1 million in collateral. This is based on the lower of market value or cost, discounted to 50% for bulk wine, and 80% for case wine.

Rabobank is further secured by accounts receivable. Total accounts receivable are $593,278. Again, applying Rabobank's borrowing base methodology, which excludes all aged accounts and other accounts deemed uncollectible for any reason, and discounts the balance to 80%, the borrowing base in accounts receivable is $98,370. Deerfield presently also has cash and cash equivalents of approximately $200,000.

Rabobank is also secured in other personal property assets, including approximately 2,000 barrels as well as barrel racks and related goods. Deerfield's book value for these is $962,805. Applying an extremely low liquidation value of $150, which is less than the reasonable market value of used barrels, the liquidation value of this collateral would be $300,000. Deerfield's balance sheet shows other assets of $324,284. For the purposes of demonstrating the sufficiency of the bank's security, a minimum value of $100,000 is used. The actual fair value of these assets is substantially more.

41. Based on the above, applying Rabobank's own appraisal of the real property, and Rabobank's liquidation value methodologies for other collateral, Rabobank's collateral under any circumstances exceeds $16.2 million, as shown on the attached calculation. The most recent statement from Rabobank indicates a balance of $10,914,586.77, including interest accrued through February 1, 2015. ***In other words, Rabobank enjoys an equity cushion of not less than $5 million, or 45%.***

    2. *Preservation of Going Concern Value Protects Rabobank*

In addition to the value of Deerfield's physical assets, a substantial amount of value is associated with the going concern value of its ongoing business operations. In large part this is driven by the substantial difference between prices that can be achieved through ordinary course retail and wholesale distribution versus liquidation prices. That value can be preserved only if Deerfield continues to operate, which requires that it fund the ordinary expenses of its operations. Continuing to operate maintains the value of the business for Rabobank, as well as Deerfield's other creditors and equity holders. Preserving the going concern value of the business provides Rabobank with protection for the use of its cash collateral.

This is illustrated by the net cash flows shown on the Budget. While there is some fluctuation during the Budget period, consistent with typical cash flows for this period, over the entire 13-week period, net cash is expected to increase by approximately $130,886. This clearly demonstrates that Rabobank is best protected by allowing the business to continue to operate in the ordinary course.

### 3. *Deerfield is Willing to Provide a Replacement Lien to Further Protect Rabobank*

Although Deerfield believes that Rabobank is more than protected by a large equity cushion and by the going concern value of the continued operations of the business, Deerfield proposes to provide Rabobank with replacement liens on Deerfield's post-petition assets. This will further protect Rabobank from any post-petition decreases in its collateral base that might result from use of the cash collateral.

The replacement lien provided to Rabobank should be of the same nature, extent, validity and enforceability as its pre-petition liens, since neither Deerfield nor any committee that may be appointed has had the opportunity to conduct a thorough review of the liens. In addition, all avoidance rights belonging to the bankruptcy estate should be excluded from the replacement lien, consistent with the Bankruptcy Code.

## VI. CONCLUSION

Use of cash, including cash collateral, is essential to the preservation of Deerfield's business and going concern value. The Court can authorize the use of cash notwithstanding the absence of consent by Rabobank, although Deerfield hopes to obtain the consent of Rabobank.

The Court may condition the use of cash on the provision of adequate protection to Rabobank so as to protect it from a diminution in the value of its collateral base. Here, no net loss of cash is contemplated, and the balance of Rabobank's collateral base provides Rabobank with a massive equity cushion.

Rabobank's interests will be adequately protected by the large equity cushion resulting from the fact that Deerfield's asset value far exceeds the amount of Rabobank's loans,

preservation of Deerfield's going concern value, and, in the unlikely event of a diminution in value, replacement liens on post-petition assets to secure that diminution.

## VII. **PRAYER**

WHEREFORE, Deerfield respectfully requests that the Court enter an interim order in the form attached hereto, and a final order:

1. Granting the Cash Collateral Motion;

2. Authorizing Deerfield, following the final hearing, to freely use cash collateral in the ordinary course of its operations, as generally contemplated by the Budget (as it is from time to time amended), and as otherwise contemplated by such orders as this Court may hereafter enter;

3. Affording Rabobank replacement liens against Deerfield's post-petition assets (other than rights and causes of action arising under Chapter 5 of the Bankruptcy Code) with the same nature, extent, validity, and enforceability as their pre-petition liens, but solely to secure any diminution in the value of its collateral; and,

4. Granting such further relief the Court deems just and proper.

DATED: February 13, 2015          MCNUTT LAW GROUP LLP


By:      /s/ *Shane J. Moses*
         Shane J. Moses
         Proposed Attorneys for DEBTOR