MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
THOMAS B. RUPP (CSBN 278041)
219 9th Street
San Francisco, California 94103
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

Proposed Attorneys for DEBTOR

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re<br><br>DEERFIELD RANCH WINERY, LLC,<br><br>Debtor. | Case No. 15-10150-AJ<br><br>Chapter 11<br><br>**DECLARATION OF ROBERT REX IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Judge: Hon. Alan Jaroslovsky<br>Date: TBD<br>Time: TBD<br>Place: United States Bankruptcy Court<br>      99 South "E" Street<br>      Santa Rosa, CA 95404 |

I, Robert Rex, declare as follows:

1. I am one of the Managing Members of Deerfield Ranch Winery, LLC ("Deerfield"). I have been the head winemaker and a managing member of Deerfield since its formation, and am one of its founders, along with my wife, Paulette J. (PJ) Rex, who is also a managing member. I make this Declaration of my personal knowledge and based on my review of Deerfield's books and records and inquiries of Deerfield's managers and employees. I could and would competently testify as follows:

## I. BACKGROUND

**A.     Deerfield Ranch Winery**

2.     Deerfield Ranch Winery is an award-winning winery located in the heart of the Sonoma Valley, founded by me and my wife PJ Rex. Specializing in blended wines, Deerfield's winemakers carefully craft some 20 different wines in small lots from specially selected Sonoma vineyards. Deerfield has 27 Sonoma County and one Mendocino County independent vineyards under contract to grow grapes for its wines. Annual production totals approximately 30,000 cases, including both Deerfield brands and the winery's substantial custom-crush business, which includes 12 small family-owned wineries. Deerfield's custom crush clients bring grapes from an additional 16 independent vineyards. Although issues with our secured lender have necessitated this filing, the winery operations are strong, profitable, and growing.

3.     Deerfield Ranch Winery has a long history. I am now on my forty-third consecutive vintage as a winemaker, after starting in 1972. Deerfield Ranch Winery was founded in 1982, when PJ and I moved to our home, which was the original winery and is located on the ridge above the current winery. We began selling wine under the "Deerfield" name in 1984.

4.     Deerfield Ranch Winery, LLC was formed in 1999, in order to provide for expansion of the business by selling membership interests units to investors. The winery LLC is owned by 87 members. PJ and I are have been the Managing Members since the LLC was formed. Deerfield's LLC members have contributed more than $15 million dollars to the business.

5.     The current winery property was acquired in 2000, as the beginning of a substantial expansion of the Deerfield Ranch Winery. The Deerfield estate is approximately 47 acres, located in Kenwood, California. Approximately 7 acres are planted in biodynamically farmed vineyards. The property includes 14 acres of wetlands which are being restored by us and provide valuable natural habitat. The original Deerfield Ranch, acquired in 1982, is now the residence of Robert and PJ Rex. The LLC rents office space and warehouse space at the Rex residence. The winery property includes a 23,000 square foot wine cave, with a capacity for 2,500 barrels. The winery

tasting room and retail sales are located in a grand room in the center of the cave. There is also a modern production facility, located in a barn-styled building adjacent to the cave.

6. Production at the new winery began with the 2005 harvest, and the winery opened to the public in 2008 after we completed construction of a required left hand turn lane on Highway 12. Since the winery opened, revenues and gross profits have generally improved from year to year.[1] During the same period, Deerfield has grown from the two of us to 22 employees supporting numerous families.

**B.** **Construction of the Winery**

7. After Deerfield acquired the current property in 2000, planting of the estate vineyards and construction of the winery began almost immediately. The first harvest from the vineyards was in 2005.

8. Construction almost immediately faced a major set-back in connection with a Sonoma County permit requirement that the winery construct a left turn lane on Highway 12 before the winery could open to the public. Construction of the turn lane was originally estimated to cost approximately $300,000 and take six months. Under the jurisdiction of Cal-Trans, the project took almost five years, and cost the winery approximately $1.75 million. The real cost to the winery, including lost sales over the years the winery could not open to the public, was as much as $8 million.

9. The total cost of the land and improvements for the Deerfield property was approximately $16 million. Costs resulting from the long delay due to the left turn lane added another $6.6 million, primarily in lost sales. In addition to the turn lane, construction included Deerfield's modern, state-of-the art production facility and the magnificent caves and tasting room. The winery and tasting room opened to the public in 2008. *In total, Deerfield and its members invested $15,886,000 in the real property and improvements.*

---

[1] The extra cost of bank fees associated with Special Assets drove 2014 net profits lower than 2013. But for these additional fees, 2014 profits would again have been higher than 2013.

## C. The Rabobank Loans

10. The cost of construction was funded in part through the sale of member equity, various bridge loans, loans from members, and construction loans. In 2007, Deerfield approached Rabobank and was told, after Rabobank conducted months of due diligence, that Deerfield qualified for an $11 million fully amortized term loan to refinance and consolidate the various loans that had financed construction. When Deerfield's managers received the initial loan documents back from Rabobank at the end of 2008, we were informed that Rabobank would only provide an $8 million term loan, because of the dramatic downturn in the market. This was in late 2008, in the early stages of the Great Recession, when the banking system was on the verge of collapse and the credit market had virtually dried up. Rabobank offered to provide the other $3 million in the form of a line of credit, secured by Deerfield's inventory and accounts receivable borrowing base, which would come due in 2010. Deerfield expressed concern about these terms, because it would be impossible for Deerfield to repay the $3 million line of credit in 15 months. Deerfield was assured by Rabobank Vice President, Jeff Wright, that the bank would roll the $3 million line of credit into the term loan when it became due in 2010. When the line of credit came due, however, Rabobank refused to do this.

11. It was the understanding of Deerfield management that the $8 million term loan was amortized, after a short interest-only period, with monthly principal and interest payments over its 7-year term. This was what we were told by Rabobank, and nothing in the initial documents indicated otherwise. We did not understand there to be any annual balloon payments. We understood that the monthly payments were for the amortized amount. As required by Rabobank, the loan documents were reviewed by the accounting firm of Moss Adams. The Moss Adams review did not reflect that the loans required anything other than regular monthly payments.

12. During the first year of the Rabobank loans, Deerfield made all payments in a timely fashion. In January 2010, however, Deerfield was informed that Rabobank was demanding an annual principal payment of $206,000 on the $8 million term loan. Deerfield had understood

the term loan to not require any balloon principal payments prior to its maturity. In response to Deerfield's inquiry, Rabobank provided a "Schedule of Principal Payments of Term Loans," showing annual principal payments due on December 1 of each year, starting in 2009. Deerfield management had never seen this document before, nor had the accounting firm that reviewed the loan files, Moss Adams. This is supported by the fact that the original review by Moss Adams had a note reflecting that the repayment schedule for the $8 million term loan was "interest only payments until December 1, 2009; monthly payments of principal and interest thereafter."

13. Because the winery could not support these large principal pay-downs, Deerfield management sought a modification of the loans to amortize the principal pay-downs. This would have allowed Deerfield to meet its obligations without default. Despite the efforts of Deerfield management to address the situation in a responsible manner, Rabobank refused to amortize the principal payments, and instead threatened foreclosure, despite the fact that Deerfield had made its monthly payments consistently and without fail.

14. Under duress, Deerfield was forced to accept Rabobank's amendment, which simply delayed the date of the balloon payment, and actually accelerated the due date of the line of credit from August to April 2010. Over the next four years, Deerfield was forced to sign multiple further amendments, each time extending the due date of the line of credit by only a few months. Although Deerfield made substantial principal pay-downs, the modifications that Rabobank required ultimately consolidated multiple balloon payments into one massive payment of $567,000, followed by a pay-off of the $3,000,000 line of credit three months later. Deerfield could not hope to pay these amounts on this schedule. Inevitably, Deerfield was unable to make this unreasonable payment of $567,000 on December 31, 2013 and the $3,000,000 line of credit due March 31, 2014. Rabobank then filed a judicial foreclosure action in February 2014 (the "Foreclosure Action").

15. During the entire five years the loans were outstanding, prior to Rabobank filing the Foreclosure Action in February 2014, Deerfield consistently and without fail made its regular monthly payments. These payments totaled approximately $43,000 per month for the two loans

and the costly interest rate swap agreement required by Rabobank. Deerfield continued making these payments reliably throughout the course of the loans, until Rabobank halted the ACH for the term loan and the line of credit withdrawals starting in January 2014. Rabobank continued to withdraw interest swap payments on January 2, 2014 in the amount of $14,351 and on February 2, 2014 in the amount of $14,805. Even after Rabobank filed its foreclosure action on February 10, 2014, Deerfield continued to make interest payments, paying more than $360,000 in 2014.

16. The loans were assigned to Rabobank's Special Assets group in April 2010. Being assigned to Special Assets resulted in substantial fees, in addition to the regular monthly payments, which Deerfield continued to make. Over the past five years, Deerfield has paid more than $275,000 in fees levied in connection with modifications to extend the due date of the line of credit, and other Special Assets requirements. Deerfield also made more than $325,000 in principal payments on the term loan during this time, in addition to the regular monthly payments on both loans. *In sum, over the five years and two months between the funding of the loans and Rabobank filing a foreclosure action, Deerfield paid Rabobank more than $4.1 million on these loans totaling $11 million.*

**D.** **The State Court Litigation and Receiver**

17. Despite the fact that Deerfield had never failed to make its regular monthly payments, and had paid almost $4 million over the preceding five years, Rabobank filed a judicial foreclosure action in February 2014 (the "State Court Action"). In May 2014, in order to end the ongoing and substantial costs of litigation and to provide an opportunity to seek refinancing, Deerfield entered into a stipulation with Rabobank in the State Court Action (the "Rabobank Stipulation"). The Rabobank Stipulation required a payment of $138,000, which was made, and provided for a six-month period to seek refinancing, after which a receiver would be appointed. Unfortunately, Rabobank's foreclosure action had tainted the financial reputation of Deerfield Ranch Winery, making it impossible to obtain conventional financing. After a 30-day extension of the forbearance period (for which Deerfield paid an additional $10,000), John Hawkins was

appointed as receiver on December 4, 2014 (the "Receiver"), pursuant to the terms of the Rabobank Stipulation.

18. The Rabobank Stipulation provided that unless a $252,000 payment was made by January 31, 2015, Rabobank would be free to foreclose, in lieu of the Receiver continuing to market the property. There was no way that Deerfield could reasonably make this payment, given that the Receiver now controlled the winery bank accounts. Therefore the payment was not made, leaving open the possibility of foreclosure. After careful consideration, Deerfield's managers determined that the only responsible action in order to protect the rights of all creditors and equity holders was filing the instant bankruptcy petition.

**E.** **Deerfield Ranch Winery's Ownership**

19. Deerfield is an LLC, with 87 members. The members have made investments ranging from $75,000 to $1,000,000. In total, Deerfield's members invested $15 million in the winery. The membership structure includes 9 "Class A" members, who are entitled to a preferred return, and 87 regular members, including the Rexes.[2] Unless forced into a fire-sale by Rabobank, the value of Deerfield exceeds all debts by a significant amount, meaning that there is substantial value to be preserved for the equity holders. The company thus has a duty to its members to maximize value and protect the rights of equity. This Chapter 11 filing was necessitated in large part by the need to prevent a fire-sale by Rabobank, which could deprive Deerfield's investors of the ability to see any meaningful recovery from their substantial investments.

**F.** **Upward Trend in the Wine Industry**

20. The Rabobank loans were entered into in December 2008, at the beginning of the Great Recession, which was the worst recession in the wine business since Prohibition. Winery land values had declined from their 2007 peak. Consistent with the overall recovery of real estate values in California, Napa and Sonoma land values have been steadily recovering in value from 2010 onward. Demand for the high-end wine that Deerfield produces is also strong and

---

[2] The "Class A" members also hold regular membership interests.

increasing. Rabobank's own industry analysis from 2014 states that, "[c]ontinued growth in sales of luxury wines is creating increasing demand for high-quality North Coast fruit, but there is almost no additional land left to plant new vineyards." In other words, over the entire time that Deerfield's loans have been in Rabobank's Special Assets department, Rabobank's position with regard to its most important collateral has been steadily improving.

## II. DEERFIELD'S CURRENT OPERATIONS

21. Deerfield is a highly respected, profitable business with a very high likelihood of a successful reorganization, despite its troubles with the Rabobank loans. After opening to the public in 2008, the winery business has grown steadily, despite being hampered by the banking relationship. Deerfield has been profitable in 2012 and 2013, even after debt service, including the substantial annual payments made that were required by Rabobank. Net profit was $100,000 on $3.1 million in revenue in 2012, $125,000 on $3.4 million in 2013. During these past three years EBITDA has been $972,000 in 2012, $1.2 million in 2013, and $767,000 in 2014. Even with the debt service and the punishing additional expenses associated with being assigned to Special Assets, Deerfield has had a generally positive bottom line. Without the $84,687 in extraordinary costs associated with the foreclosure action and receivership in 2014, adjusted EBITDA was $850,000, meaning that net profit would have been $77,000 without these extraordinary costs.

22. Sale of Deerfield Ranch Winery labeled wine is the core of Deerfield's business, representing about 60% of total revenue. These high-end wines are all hand-crafted at the winery by me and the winemaking team, and for the most part retail between $24 and $85 a bottle, with a few limited bottlings at higher price points. Deerfield wines are extremely well regarded, and have won more than 365 awards, including 8 best of show, 32 best of class, and 88 gold or double gold medals. In the same period, Deerfield has had 28 wines rated over 90 points. Deerfield produces about 15,000 cases per year, much of which is sold under the Deerfield Ranch Winery brand. A portion of the Deerfield wine produced also goes into the winery's successful @Wine brand and Deerfield's private label wine program.

23. As part of its regular business operations, Deerfield also regularly sells bulk wine that is excess to its needs for Deerfield brand wine and the private label program. These bulk wine sales are used in part to address short term cash flow needs.

24. In 2010, in order to expand its market, Deerfield launched Deerfield@Wine, a second Deerfield brand. This label was created to market to younger consumers who are seeking high quality wines at an affordable price. These wines are labeled with the @ symbol, the most recognized symbol in the world, which, in conjunction with the word "Arroba," has been copyrighted by Deerfield for use in connection with wine. The price point of Deerfield@Wines is $24 to $40 per bottle. Because this wine is a negotiant product, production can be readily scaled to meet demand. Revenue from Deerfield@Wine sales now ranges from $200,000 to more than $300,000 per year.

25. In addition to production of its own wines, Deerfield has an active custom crush business with 12 custom crush and alternating proprietor clients. Deerfield makes between 12,000 and 20,000 cases of wine for custom crush clients each year. This provides substantial addition revenue and shorter-term cash flow, in excess of $300,000 per year.

26. Deerfield has continued to pay its vendors in the ordinary course of business, in spite of its struggles with Rabobank. As a result, Deerfield's unsecured debt is only the routine accounts that are to be expected for a winery at this point in the year. Deerfield's only other substantial debt is a Sonoma County property tax lien, in the principal amount of $565,800, with accrued interest of approximately $189,000. When Deerfield was forced to make large principal payments to Rabobank, the only way that it could make these payments without jeopardizing operations was to use funds that otherwise would have gone to pay real property taxes.

27. Attached hereto as Exhibit A is a weekly cash flow budget setting forth Deerfield's expected cash needs and cash receipts over the next thirteen weeks. The Budget illustrates Deerfield's expected cash flows over the thirteen weeks beginning February 9, 2015. Starting cash position on February 9 was approximately $195,000. Over the Budget period, this is

expected to increase to $325,886. A substantial part of this positive net cash flow comes from the wine club shipment scheduled for the week of March 23, 2015.

### III. INTENDED REORGANIZATION

28. Deerfield believes that any attempt sell the business in the immediate term would result in depressed offers that do not reflect the actual value of the business. While Deerfield is amenable to exploring a sale if it appears that an appropriate value can be realized for the benefit of all of its constituencies, it is probable that a reorganization process is more likely to protect the rights of all of Deerfield creditors *and* equity holders.

29. Deerfield therefore expects to promptly propose a plan of reorganization, which restructures its debt so that it can operate successfully for some period, perhaps five years. Within that time, the company would expect to sell the business or refinance the debt. The plan of reorganization will most likely contemplate extending the Rabobank debt for a period of time, at a reasonable interest rate that is fair to both the bank and other creditors/ equity holders. Reorganization of the Rabobank loans into a long-term, fully amortized note or notes is also a possibility. In either case, Deerfield expects that it will be able to propose a plan that pays unsecured creditors in full, over time, allowing equity to remain in place.

### IV. CASH COLLATERAL AND ADEQUATE PROTECTION

30. The value of Rabobank's collateral base far exceeds the amount of its loans. The Rabobank loans are secured by liens encumbering substantially all of the assets for Deerfield. The security interest asserted by Rabobank extends to cash and deposit accounts. Deerfield has not determined whether there is any meritorious basis on which the nature, perfection, extent, or validity of the liens can be challenged.

31. most recent statement received from Rabobank, as of January 16, 2015, states that the principal balance of the term loan is $7,659,000.00, and that the principal balance of the line of credit remains $3,000,000.00, for a total principal balance on the loans of $10,659,000.00. The

statement also shows accrued interest through February 1, 2015, of $155,924.27 on the term loan, and $99,662.50 on the line of credit. The total Rabobank claim, including accrued interest, as of February 1, 2015, is therefore $10,914,586.77.

32. Deerfield requests authority to use its cash in the ordinary course of its business to fund operations. The attached Budget shows Deerfield's expected cash flows resulting from the use of cash collateral.

33. Based on my many years in the wine industry, my familiarity with the business, and my knowledge of the current market in Sonoma, I believe a reasonable value for Deerfield Ranch Winery is between $25 and $35 million. Approximately $15.9 million was invested the land and improvements, including the wine cave, the roadways, the production facility, and the left turn lane off of Highway 12. Land values in Sonoma have also increased substantially since 2000. Deerfield's inventory has a value, through ordinary course sales channels, in excess of $7.4 million. There is substantial additional value in equipment, barrels, IP, and other assets. Deerfield also has a vested permit from the county of Sonoma to build a larger 17,000 sq ft winery and public building on the property. This vested permit is of substantial value, given the extreme difficulty of obtaining new winery permits in the Sonoma Valley.

34. While Deerfield believes the value of the business is at least $25 to $35 million, a determination of the actual value is not necessary at this stage. Deerfield should be permitted to use its cash in order to operate its business because even the most conservative liquidation valuation indicates that the collateral securing Rabobank's liens substantially exceeds the amount of the loans. Attached hereto as **Exhibit B** is a chart showing a liquidation value floor for the value of Rabobank's collateral, based on using Rabobank's own methodologies and appraisals, and extremely conservative liquidation values. This chart is not intended to represent the real value of Deerfield or its assets. It simply shows that there is no reasonable calculation under which Rabobank does not have a substantial equity cushion, as discussed in more detail below.

35. Deerfield has not had the opportunity to have its own professional appraisal of its real property. Rabobank has, however, conducted multiple appraisals over the course of the loan.

1　In February 2012, Rabobank had an appraisal prepared by the very respected firm of Correia-
2　Xavier, Inc. (the "2012 Rabobank Appraisal"). This 2012 Rabobank Appraisal indicated a value
3　of $11,400,000 for the real property. This appraisal, done during the Great Recession, compares
4　to a 2008 appraisal, also prepared at the bank's request, which showed a value, before the winery
5　improvements were completed and the winery was open to the public, of $14.5 million.

6　　　　36.　That the 2012 Rabobank Appraisal presents a floor is further supported by the most
7　recent report from the receiver appointed by the bank, for the month of January 2015. The
8　receiver's report provides information on the estimates of value for the real property provided by
9　brokers considered by the receiver, and states that "a range of values was suggested, from
10　approximately $11 Million to $18 Million, with both groups feeling that a mid-range value of $15
11　Million + was attainable." Deerfield believes that this is a very conservative range, driven by the
12　depressed market created in a receivership sale.

13　　　　37.　The 2012 Rabobank Appraisal presents an absolute floor for the real property
14　value. It is well known and universally accepted that real estate values in Sonoma County, and in
15　particular in the Sonoma Valley, have steadily increased through 2012, 2013, and 2014.

16　　　　38.　Rabobank is also secured by Deerfield's substantial wine inventory, including both
17　bulk wine and case goods. The market value of this inventory is at least $7.4 million, if sold in the
18　ordinary course of Deerfield's business, applying Deerfield's usual allocation of distributor,
19　wholesale, and retail sales. Even applying Rabobank's extremely conservative borrowing base
20　methodology, which is designed to provide a minimum liquidation value, the inventory represents
21　an additional $4.1 million in collateral. This is based on the lower of market value or cost,
22　discounted to 50% for bulk wine, and 80% for case wine.

23　　　　39.　Rabobank is further secured by accounts receivable. Total accounts receivable are
24　$593,278. Again, applying Rabobank's borrowing base methodology, which excludes all aged
25　accounts and other accounts deemed uncollectible for any reason, and discounts the balance to
26　80%, the borrowing base in accounts receivable is $98,370. Deerfield presently also has cash and
27　cash equivalents of approximately $200,000.

28

40. Rabobank is also secured in other personal property assets, including approximately 2,000 barrels as well as barrel racks and related goods. Deerfield's book value for these is $962,805. Applying an extremely low liquidation value of $150, which is less than the reasonable market value of used barrels, the liquidation value of this collateral would be $300,000. Deerfield's balance sheet shows other assets of $324,284. For the purposes of demonstrating the sufficiency of the bank's security, a minimum value of $100,000 is used. The actual fair value of these assets is substantially more.

41. Based on the above, applying Rabobank's own appraisal of the real property, and Rabobank's liquidation value methodologies for other collateral, Rabobank's collateral under any circumstances exceeds $16.2 million, as shown on the attached calculation.

42. In addition to the value of Deerfield's physical assets, a substantial amount of value is associated with the going concern value of its ongoing business operations. In large part this is driven by the substantial difference between prices that can be achieved through ordinary course retail and wholesale distribution versus liquidation prices. That value can be preserved only if Deerfield continues to operate, which requires that it fund the ordinary expenses of its operations. Continuing to operate maintains the value of the business for Rabobank, as well as Deerfield's other creditors and equity holders. Preserving the going concern value of the business provides Rabobank with protection for the use of its cash collateral.

43. The value of Deerfield continuing to operate as a going concern is illustrated by the Budget. Over the entire 13-week period, net cash is expected to increase by approximately $130,886.

44. Although Deerfield believes that Rabobank is more than protected by a large equity cushion and by the going concern value of the continued operations of the business, Deerfield proposes to provide Rabobank with replacement liens on Deerfield's post-petition assets. This will further protect Rabobank from any post-petition decreases in its collateral base that might result from use of the cash collateral.

## V. PRE-PETITION WAGES AND BENEFITS

45. Deerfield currently has twenty-one employees: six salaried employees, thirteen hourly workers, and two commissioned salespeople. The salaried employees work in various management roles in the winery. The hourly employees work in wine production, sales, and operating the winery's tasting room.

46. The employees are paid twice each month, on the 5th and 20th days of the month. The employees are paid on the 20th day of each month for the days worked from the first through 15th days of that month. The employees are paid on the 5th day of each month for the days worked from the 16th through the end of the previous month.

47. The next payroll date falls on February 20, 2015, for the February 1-15 pay period, and thus includes both the post-petition period from February 13 through February 15, and the pre-petition period from February 1 through February 12. The employees are therefore owed these pre-petition wages, which would be approximately 75% of the total payroll amount. Deerfield estimates the total pre-petition wages owed to the six salaried employees to be $11,500.27 (with the highest being $3,287.67), and the pre-petition wages owed to the thirteen hourly employees to be $11,047.00 (with the highest being $1,296.00). At this time, Deerfield believes that no more than $200.00 in commissions is owed to the two salespeople.

48. The total amount required to pay pre-petition wages owed for the February 1-12 period is approximately $22,747.27.

49. It is possible that in some cases, employees may not have deposited their paycheck issued on February 5, 2015. Because Deerfield does not currently have access to the receiver's bank accounts, this could not be verified. To the extent this is the case, Deerfield seeks authorization for those paychecks to be honored, or if necessary reissued. The February 5 paychecks are not more than $4,400.00 to any individual employee. Therefore, even for the highest salaried employee, even if the February 5 paycheck has not been cashed, the total pre-petition wages owed would not be more than $7,700.00.

50. Deerfield believes that it is important to honor their employee benefit obligations to the fullest extent permissible. Even including sick leave and vacation entitlements, no employee is entitled to an amount of pre-petition wages and benefits in excess of $12,475.00. If the Debtor is permitted to honor benefit obligations up to an aggregate of $12,475.00, this will allow the employees to enjoy full benefits. This will be a significant factor in sustaining employee morale and loyalty in the face of this bankruptcy filing.

## VI. UTILITIES

51. Deerfield's principal utility is Pacific Gas & Electric ("PG&E"). The average monthly bill for PG&E services in 2014 was $4,991.52. Deerfield believes that to the extent that PG&E demands the protection of a deposit, it will be adequately protected by receiving a post-petition deposit equal to the average monthly bill, in the amount of $4991.52.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed February 13, 2015, at Glen Ellen, California.

/s/ *Robert Rex*
Robert Rex