MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
THOMAS B. RUPP (CSBN 278041)
219 9th Street
San Francisco, California 94103
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

Attorneys for DEBTOR

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re | Case No. 15-10150-AJ |
| DEERFIELD RANCH WINERY, LLC, | Chapter 11 |
| Debtor. | Judge: Hon. Alan Jaroslovsky |

**DEBTOR'S DISCLOSURE STATEMENT**

*To Accompany Plan of Reorganization Dated October 30, 2015*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................ 1

II. SUMMARY OF PLAN TREATMENT ...................................................... 2

III. CONFIRMATION PROCEDURE .......................................................... 3

    A.    Right to Vote on the Plan ................................................................. 3

    A.    Acceptance or Rejection of the Plan and Cramdown .................... 3

    B.    Voting Instructions .......................................................................... 4

    C.    Confirmation Hearing ..................................................................... 4

IV. BACKGROUND OF DEERFIELD ......................................................... 5

    A.    Deerfield Ranch Winery ................................................................. 5

    B.    Construction of the Winery ............................................................ 6

    C.    The Rabobank Loans ...................................................................... 6

V. FACTORS LEADING TO THE BANKRUPTCY FILING ...................... 7

    A.    Deerfield's Secured Loan Obligations ........................................... 7

    B.    The State Court Litigation and Receiver ....................................... 7

VI. THE BANKRUPTCY CASE AND RABOBANK SETTLEMENT ......... 8

    A.    The Committee ................................................................................ 8

    B.    The Rabobank Settlement .............................................................. 9

VII. THE DEERFIELD BUSINESS AND ITS CONTINUED OPERATIONS ............................ 9

VIII. PLAN OF REORGANIZATION ......................................................... 10

    A.    Payment of Administrative Claims ............................................... 10

    B.    Treatment of Creditor and Equity Classes ................................... 11

    C.    Executory Contracts ..................................................................... 17

IX. IMPLEMENTATION OF THE PLAN ................................................... 18

    A.    Revesting Subject to Plan ............................................................. 18

    B.    Bankruptcy Transition and Procedure ......................................... 18

Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:25    Page 2 of 29

00054736

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

| | | | |
|---|---|---|---|
| C. | Management and Corporate Matters | ...................................................................... | 18 |
| D. | Objections to Claims | ............................................................................................ | 19 |
| E. | Co-Obligor Claims | ................................................................................................ | 19 |
| F. | Discharge | ............................................................................................................... | 20 |
| G. | Releases | ................................................................................................................. | 20 |

X. ALTERNATIVES TO THE PROPOSED PLAN ............................................................. 20

| | | | |
|---|---|---|---|
| A. | Going Concern Sale in Chapter 11 | ...................................................................... | 20 |
| B. | Liquidation | ............................................................................................................ | 20 |
| C. | Non-Consensual Plan | ........................................................................................... | 22 |
| D. | Conclusion | ............................................................................................................. | 23 |

XI. OTHER ISSUES ........................................................................................................... 23

| | | | |
|---|---|---|---|
| A. | Feasibility of the Plan | ......................................................................................... | 23 |
| B. | Risk Factors | .......................................................................................................... | 25 |
| C. | Tax Consequences | ................................................................................................ | 25 |

XII. CONCLUSION ............................................................................................................ 26

00054736-4

Case: 15-10150   Doc# 155   Filed: 10/30/15   Entered: 10/30/15 17:38:25   Page 3 of
29

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

# I. __INTRODUCTION__

Deerfield Ranch Winery, LLC, the debtor and debtor-in-possession in the above captioned Chapter 11 reorganization case ("Deerfield" or the "Debtor"), has filed its Plan of Reorganization dated October 30, 2015 (the "Plan").

This Disclosure Statement explains the circumstances leading to Deerfield's bankruptcy filing, the nature of the Debtor's business and the Debtor's expectations for its business going forward, the Plan and its means of implementation, and the available alternatives to the Plan. The Court has determined that this Disclosure Statement contains sufficient information to enable creditors to make an informed judgment about the Plan.[1] As described herein, Deerfield believes that acceptance and confirmation of this Plan will provide the greatest return to creditors and equity, and is superior to any available alternative.

The Plan is the product of a Settlement between Deerfield; its primary secured lender, Rabobank N.A. ("Rabobank"); and the Official Committee of Unsecured Creditors in this case (the "Committee"). Through the Settlement, Deerfield, Rabobank, and the Committee reached agreement on terms for treatment of the Rabobank debt in a consensual plan.

In general, the Plan provides for payment of general unsecured claims over a two-year period, with interest. Rabobank will be paid through a restructured note that matures in five years. Priority claims and other secured claims will be paid on or within 30 days of the effective date. The Plan also provides for ownership of the business to be retained by the current equity holders. Although this treatment is described below, creditors and equity holders should review the Plan itself. Treatment of creditors and equity holders under Deerfield's proposed Plan is described in more detail below.

---

[1] This statement will be true when the Disclosure Statement is submitted to creditors in connection with the solicitation of ballots; it is not true as of the date this Disclosure Statement has been filed with the Court. If this Disclosure Statement is approved by the Court, this footnote will be removed prior to circulation to creditors.

## II.  SUMMARY OF PLAN TREATMENT

The following is a brief summary of classes of creditors and interest holders under the proposed Plan, and the treatment of each provided for in the Plan.

| Class | Creditors / Interest Holders | Treatment |
|---|---|---|
| Unclassified Administrative Claims | Bankruptcy professionals and other administrative claimants | Paid in full on Effective Date (estimated December 31, 2015). |
| Unclassified Priority Tax Claims | Taxing authorities | Paid in full on Effective Date (estimated December 31, 2015). |
| Class 1A | Sonoma County real property tax debt | Paid in full over five years, with interest at the legal rate. |
| Class 1B | Rabobank secured claim | Claim fixed at $11.75 million, paid over five years, with monthly payment of interest at the greater of 5% or LIBOR plus 3.5%. Annual principal payments starting at $150,000 in 2016 and increasing to $550,000 in 2019. Payment in full no later than the maturity date of December 31, 2020. |
| Class 1C | Other secured claims (Grape Growers) | Paid in full on or before January 31, 2016. |
| Class 2 | Priority Claims | Paid in full on Effective Date (estimated December 31, 2015). |
| Class 3A | General Unsecured Claims | Payment in full, with quarterly payments over two years, with amortized interest at 3%. |
| Class 3B | Deferred Unsecured Claims of Deerfield Managers | Payment of interest only at 3% with payment of the balance following payment of all other claims. |
| Class 4A | Equity Interests defined as "Class-A Units" in the Deerfield LLC Operating Agreement | Preserved intact, but deferred dividend payments are converted to additional units. |
| Class 4B | General Equity Interests | Preserved intact. |

2

DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

000547564

# III. CONFIRMATION PROCEDURE

## A. Right to Vote on the Plan

The Bankruptcy Code provides that only holders of claims or interests that are impaired under the terms of a Chapter 11 plan, and that are not deemed to have automatically rejected the Plan, are entitled to vote on to accept or reject the Plan. Holders of claims or interests in classes that are not impaired are conclusively assumed to accept the Plan and not entitled to vote.

With respect to the proposed Plan, holders of Claims in Class 2 (priority Claims) and Interests in Class 4B (equity interests) are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Holders of Claims or Interests in Classes 1A, 1B, 1C (secured claims), 3A (general unsecured Claims), 3B (voluntarily deferred unsecured Claims), and 4A (preferred equity Interests) are impaired and are entitled to vote to accept or reject the Plan.

## A. Acceptance or Rejection of the Plan and Cramdown

As provided in the Bankruptcy Code, a class of Claims accepts the Plan if creditors in that class that hold at least two-thirds in dollar amount, and more than one-half in number, of the total of Claims in that Class cast ballots vote to accept the Plan. A class of equity Interests accepts the Plan if creditors in that class that hold at least two-thirds in dollar amount of the total of Interests in that Class cast ballots vote to accept the Plan. If a class of Claims or Interests does not accept the Plan, that Class is deemed to have rejected it.

If a Class of Claims or Interests rejects the Plan, the Debtor has the right, and intends, to request confirmation of the Plan nonetheless, pursuant to § 1129(b) of the Bankruptcy Code, known as a "cramdown." Section 1129(b) permits the confirmation of a plan notwithstanding the rejection by one or more impaired classes of claims or equity interests if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. The Debtor believes that the Plan meets these requirements.

The Plan provides for payment in full of all Claims, over a relatively short period. The Debtor believes that this is a better result than if its assets were liquidated under Chapter 7 of the Bankruptcy Code. Further, all equity holders retain their ownership interests through the Plan. Therefore, the Debtor believes that after carefully reviewing the Plan and this Disclosure

00054736-4    Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:25    Page 6 of 29

Statement, each holder of a Claim or Interest that is entitled to vote with respect to the Plan should vote to accept the Plan.

**B.**     **Voting Instructions**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.[2]  Your Ballot must be returned to the following address by the deadline specified on the Ballot:

> Deerfield Plan of Reorganization
> c/o McNutt Law Group LLP
> 219 9th Street
> San Francisco, CA 94103

If you are a creditor or equity holder entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call Carol Snell, at the Debtor's counsel, at (415) 995-8475.

**C.**     **Confirmation Hearing**

Pursuant to § 1128 of the Bankruptcy Code, the Confirmation Hearing will be commenced on the date set forth in the notice provided with this Disclosure Statement, before the Honorable Alan Jaroslovsky, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of California, Santa Rosa Division, 99 South "E" Street, Santa Rosa, California. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before the deadline stated in such notice.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date at the Confirmation Hearing.

---

[2] Ballots will be enclosed when the Plan and Disclosure Statement are mailed out for voting. If this Disclosure Statement is approved by the Court, this footnote will be removed prior to circulation to creditors.

00054756    Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:25    Page 7 of 29

# IV. BACKGROUND OF DEERFIELD

## A. Deerfield Ranch Winery

Deerfield Ranch Winery is an award-winning winery located in the heart of the Sonoma Valley, founded by Robert and Paulette J. ("P.J.") Rex. Specializing in blended wines, Deerfield's winemakers carefully craft some 20 different wines in small lots from specially selected Sonoma vineyards. Deerfield purchases grapes for its wines from approximately 27 Sonoma County vineyards. Annual production totals approximately 30,000 cases, including both Deerfield brands and the winery's substantial custom-crush business, which includes approximately 12 small family-owned wineries.[3] Although issues with Rabobank necessitated filing this case, the winery operations are strong, profitable, and growing.

Deerfield Ranch Winery has a long history. The head winemaker, Robert Rex, is now on his forty-third consecutive vintage as a winemaker, having starting in 1972. Deerfield Ranch Winery was founded in 1982, when Mr. Rex and his wife, P.J., moved into their home, which was the original winery and is located on the ridge above the current winery. The Rexes began selling wine under the "Deerfield" name in 1984.

Deerfield Ranch Winery, LLC was formed in 1999, in order to provide for expansion of the business by selling membership units to investors. The winery LLC is owned by 87 members. The Rexes have been the Managing Members since the LLC was formed.

The current winery property was acquired in 2000, as the beginning of a substantial expansion of the Deerfield Ranch Winery. The Deerfield estate is approximately 47 acres, located in Kenwood, California. Approximately seven acres are planted in biodynamically farmed vineyards. The property includes 14 acres of wetlands which are being restored by the winery and provide valuable natural habitat. The original Deerfield Ranch, acquired in 1982, is now the residence of the Rexes. The LLC leases office space and warehouse space at the Rex residence.

---

[3] Production may be somewhat lower in the 2015 year. In order to address the extraordinary costs of the Chapter 11 case, Deerfield is significantly cutting back its 2015 vintage, and bridging the gap with its substantial reserves from prior vintages.

DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

000547364

The winery property includes a 23,000 square-foot wine cave, with a capacity for 2,500 barrels. The winery tasting room and retail sales are located in a grand room in the center of the cave. There is also a modern production facility, located in a barn-style building adjacent to the cave.

Production at the new winery began with the 2005 harvest, and the winery opened to the public in 2008 after Deerfield completed construction of a required left hand turn lane on Highway 12. Since the winery opened, revenues and gross profits have generally improved from year to year. During the same period, Deerfield has grown from Robert and P.J. to 22 employees supporting numerous families.

**B.** **Construction of the Winery**

After Deerfield acquired the current property in 2000, planting of the estate vineyards and construction of the winery began almost immediately. The first harvest from the vineyards was in 2005.

Construction almost immediately faced a major set-back in connection with a Sonoma County permit requirement that the winery construct a left turn lane on Highway 12 before the winery could open to the public. Construction of the turn lane was originally estimated to cost approximately $300,000 and take six months. Under the jurisdiction of Cal-Trans, the project took almost five years, and cost the winery approximately $1.75 million. The real cost to the winery, including lost sales over the years the winery could not open to the public, is estimated to have been as much as $8 million.

The total cost of the land and improvements for the Deerfield property was approximately $16 million. Costs resulting from the long delay due to the left turn lane added another $6.6 million, primarily in lost sales. In addition to the turn lane, construction included Deerfield's modern, state-of-the art production facility and the magnificent caves and tasting room. The winery and tasting room opened to the public in 2008.

**C.** **The Rabobank Loans**

The cost of construction was funded in part through the sale of member equity, various bridge loans, loans from members, and construction loans. In 2007, Deerfield approached Rabobank for a long term loan to pay off the existing debt and provide additional capital.

000547364

DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

1  Although Deerfield sought an $11 million term loan, Rabobank ultimately informed Deerfield that

2  it would only provide an $8 million term loan, because of the downturn in the market. This was in

3  late 2008, in the early stages of the Great Recession, when the banking system was on the verge of

4  collapse and the credit market had virtually dried up. Rabobank offered to provide the other $3

5  million in the form of a line of credit, secured by Deerfield's inventory and accounts receivable

6  borrowing base, which would come due in 2010. Although Deerfield had concerns about its

7  ability to repay the line of credit, there was no viable alternative in the late 2008 credit market.

8  Deerfield entered into the loan agreements with Rabobank for the $8 million term loan and $3

9  million line of credit (together, the "Rabobank Loans") at the end of 2008.

10

11  ## V.  FACTORS LEADING TO THE BANKRUPTCY FILING

12  **A.  Deerfield's Secured Loan Obligations**

13  During the first year of the Rabobank Loans, in 2009, Deerfield made all payments in a

14  timely fashion. In January 2010, however, Deerfield was unable to make a principal payment of

15  $206,000, the first of several large annual principal payments on the $8 million term loan.

16  Because the winery could not support these large principal payments, Deerfield's management

17  sought a modification of the loans to amortize the principal payments. Rabobank was not willing

18  to enter into such a modification. As a result, Deerfield and Rabobank entered into a series of

19  short term amendments over the next four years, amending maturity and payment dates under the

20  Rabobank Loans.

21  Although Deerfield made substantial principal payments, the modifications eventually

22  consolidated multiple balloon payments into one payment of $567,000, due on December 31,

23  2013, followed by a pay-off of the $3 million line of credit three months later. Deerfield could not

24  pay these amounts on this schedule. As a result, Rabobank exercised its rights under the loan

25  documents and filed a judicial foreclosure action (the "State Court Action").

26  **B.  The State Court Litigation and Receiver**

27  Rabobank filed the State Court Action in February 2014. In May 2014, in order to end the

28  ongoing and substantial costs of litigation and to provide an opportunity to seek refinancing,

000547864    Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 10 of
29

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

1  Deerfield entered into a stipulation with Rabobank in the State Court Action (the "Rabobank
2  Stipulation").  The Rabobank Stipulation required a payment of $138,000, which was made, and
3  provided for a six-month period to seek refinancing, after which a receiver would be appointed.
4  Unfortunately, under the circumstances, it was impossible to obtain conventional financing. After
5  a 30-day extension of the forbearance period, John Hawkins was appointed as receiver on
6  December 4, 2014 (the "Receiver"), pursuant to the terms of the Rabobank Stipulation.

7          The Rabobank Stipulation provided that unless a $252,000 payment was made by January
8  31, 2015, Rabobank would be free to foreclose, in lieu of the Receiver continuing to market the
9  property.  There was no way that Deerfield could reasonably make this payment, as making the
10 payment would have left Deerfield unable to pay its other debts as they came due.  Therefore the
11 payment was not made, leaving open the possibility of foreclosure.  After careful consideration,
12 Deerfield's managers determined that the only responsible action in order to protect the rights of
13 all creditors and equity holders was filing the instant bankruptcy petition.

14

15         **VI.  THE BANKRUPTCY CASE AND RABOBANK SETTLEMENT**

16         Deerfield filed a voluntary petition in this Court for relief under Chapter 11 of the
17 Bankruptcy Code on February 13, 2015 (the "Petition Date").  Deerfield has continued to operate
18 its business as debtor-in-possession since the Petition Date.

19 **A.     The Committee**

20         In Chapter 11 cases, the Office of the United States Trustee (the "US Trustee") is
21 authorized to appoint a committee to represent the interests of unsecured creditors.  On March 16,
22 2015, the US Trustee appointed the Creditors Committee.  The following persons were designated
23 as members of the Creditors Committee: Yannick Rousseau, of Tonnellerie de Jarnac USA, Inc., a
24 supplier of barrels; Michael Topolos, of Topolos Vineyards LLC, who manages Deerfield's
25 vineyards on a contract basis; and David Estes of Wood Valley Road, LLC, a grape grower.  The
26 Creditors Committee retained the law firm of Pachulski Stang Zhiel & Jones as its legal counsel.

27

28

000547860  Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 11 of
29

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

**B.     The Rabobank Settlement**

Before Deerfield could reasonably enter into meaningful negotiations with Rabobank or the Creditors Committee, it was necessary to prepare thorough, transparent financial models reflecting expected revenues and expenses over the next seven years.  This was a detailed and time-consuming task, but once completed served as the basis for negotiations with Rabobank, and for the Settlement.  Rather than filing and seeking approval of its plan without creditor input, Deerfield provided a draft plan to Rabobank and the Creditors Committee in order to engage in a dialog regarding the terms of the plan, and to determine whether filing a consensual plan supported by Rabobank would be possible.

On August 27, 2015, Deerfield, Rabobank, and the Creditors Committee participated in a settlement conference conducted by Judge Carlson of the Northern District Bankruptcy Court, in an effort to resolve disputes regarding the terms of Deerfield's proposed plan of reorganization.  After extensive negotiations, the parties agreed to the principal terms of a consensual plan of reorganization, which are reflected in the Plan.

## VII.  THE DEERFIELD BUSINESS AND ITS CONTINUED OPERATIONS

Deerfield is a highly respected, profitable business with a very high likelihood of a successful reorganization, despite its troubles with the Rabobank loans.  Since opening to the public in 2008, the winery business has grown steadily, despite being hampered by the banking relationship.  Deerfield was profitable in 2012 and 2013, even after debt service, including the substantial annual payments that were required by Rabobank.  Net profit was $100,000 on $3.1 million in revenue in 2012, and $125,000 on $3.4 million in 2013.  During the past three years EBITDA has been $972,000 in 2012, $1.2 million in 2013, and $767,000 in 2014.  Even with the debt service and the punishing additional expenses associated with being assigned to special assets, Deerfield has had a generally positive bottom line.  Without the $84,687 in extraordinary costs associated with the foreclosure action and receivership in 2014, adjusted EBITDA was $850,000, meaning that net profit would have been $77,000 without these extraordinary costs.

000547866

Sale of Deerfield Ranch Winery labeled wine is the core of Deerfield's business, representing about 60% of total revenue. These high-end wines are all hand-crafted at the winery by Robert Rex and the winemaking team, and for the most part retail between $24 and $85 a bottle, with a few limited bottlings at higher price points. Deerfield wines are extremely well regarded, and have won more than 365 awards, including 8 best of show, 32 best of class, and 88 gold or double gold medals. In the same period, Deerfield has had 28 wines rated over 90 points. Deerfield produces about 15,000 cases per year, much of which is sold under the Deerfield Ranch Winery brand. A portion of the Deerfield wine produced also goes into the winery's successful @Wine brand and Deerfield's private label wine program.

In addition to production of its own wines, Deerfield has an active custom-crush business with approximately 12 custom crush and alternating proprietor clients. Deerfield typically makes between 12,000 and 20,000 cases of wine for custom-crush clients each year. This provides substantial additional revenue and shorter-term cash flow, in excess of $300,000 per year.

Deerfield has prepared financial projections for the five-year period of the Plan, which are attached hereto as **Exhibit A** (the "Projections"). Deerfield believes that the Projections are conservative and achievable.[4]

## VIII. PLAN OF REORGANIZATION

### A. Payment of Administrative Claims

Debts incurred after the commencement of a bankruptcy case are generally referred to as "administrative claims" or "administrative expenses." In order to confirm a plan of reorganization, all administrative expenses must be paid promptly after confirmation of the plan, in cash and in full. In general, administrative claims fall into two categories: the allowed fees of attorneys and other professionals employed by the estate, and other obligations of the business resulting from the ordinary course of its operations.

---

[4] The Projections are subject to the limitations and risk factors set forth in Section XI, below.

000547360

Professional fees are entitled to priority as administrative expenses only to the extent that they are approved by the Bankruptcy Court. On July 24, the Bankruptcy Court approved on an interim basis compensation for Deerfield's counsel in the amount of $163,278.28, which amount has been paid. Estimated additional professional fees through confirmation of the Plan are shown in the table below.[5]

| Professional | Description | Estimate |
|---|---|---|
| McNutt Law Group | Debtor's Bankruptcy Counsel | $195,000 |
| Jigsaw Advisors | Debtor's Financial Advisor | $167,000 |
| Pachulski Stang | Creditors Committee Counsel | $37,500 |
| | Total | $399,500 |

Administrative expense priority is also afforded to other debts incurred by the Debtor in the course of operating during the bankruptcy case, whether in ordinary course of operating the business, or in connection to the case itself (e.g., quarterly fees due to the U.S. Trustee). To the extent any U.S. Trustee quarterly fees are due and unpaid as of the Plan effective date, they will be entitled to administrative priority and paid. Because the business is paying its post-petition bills in the ordinary course, it is not clear that there will be any expenses of operation from the period of the Chapter 11 case that are due and remain unpaid at the time of confirmation.[6] To the extent that there are, they will be entitled to administrative expense priority.

**B.** **Treatment of Creditor and Equity Classes**

The Plan has a total of six classes of creditors and equity holders. The classes and their treatment are summarized below.

---

[5] The amounts shown are as estimated by Deerfield and the professionals involved. Actual amounts incurred may be materially different, as may the amounts ultimately approved by the Bankruptcy Court.

[6] Costs for purchase of grapes are normally paid over the year following harvest. There will therefore be payments to growers for the fall 2015 harvest that will be unpaid but not yet due as of confirmation. These will be paid in accordance with the Debtor's contracts with these growers.

000547360
Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 14 of
29

1    1.    *Class 1A (Sonoma County Secured Claims)*

2    Class 1A consists of the claims of Sonoma County for unpaid real property taxes, which

3    are secured by statutory property tax liens on Deerfield's real property.  The past-due amounts

4    total approximately $565,800 in unpaid taxes and $189,000 in interest and fees.

5    Under the Plan, Sonoma County will received payment in full over five years, together

6    with interest at the statutory rate required pursuant to §511 of the Bankruptcy Code, which is

7    understood to be 18% per year simple interest.  The County will retain the liens that it holds as a

8    matter of state law to secure payment of its claims.  The payments on the Class 1A Claims will

9    consist of five annual payments, each consisting of one-fifth of the principal amount of the

10   allowed Class 1A Claims, plus interest through the payment date, with such payments

11   commencing on April 15, 2016.  Successive annual payments will be due on April 15 of 2017

12   through 2020.

13   Real property taxes not yet due as of the Effective Date will be paid when due.

14   The Plan also provides that upon sale or refinance of any parcel of Deerfield property, the

15   unpaid portion of the allowed Sonoma County claims attributable to the sold parcel shall be paid

16   in full, in exchange for which the lien as to that parcel shall be released.

17   Sonoma County's claim for past due real property taxes is impaired, and Sonoma County

18   is entitled to vote on the Plan.

19   2.    *Class 1B (Rabobank Secured Claim)*

20   Class 1B consists of the secured claim held by Rabobank, secured by a deed of trust

21   encumbering all of the Debtor's real property, as well as other security interests encumbering

22   substantially all of the Debtor's assets.  Rabobank's claim is impaired and Rabobank is entitled to

23   vote under the Plan.

24   Rabobank's treatment under the Plan is as provided in the Settlement.  Rabobank will

25   receive a new promissory note and other loan documents (the "New Note" and "New Credit

26   Documents") that amend and restructure the existing loan documents (collectively, the

27   "Restructured Credit Documents).  The New Credit Documents will be filed with the Court as part

28

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

of Supplemental Plan Documents prior to the hearing on confirmation of the Plan. All parties are encouraged to review the Supplemental Plan Documents prior to voting on the Plan.

The Plan fixes the amount of the Class 1B Claim at $11,750,000, inclusive of all interest, fees, penalties or any other amounts that might be charged under the existing loan documents. This amount will also be the initial principal balance of the New Note.

The Restructured Credit Documents will provide for payment of the Class 1B claim over a period of five years, with a term beginning January 1, 2016, and maturing on December 31, 2020. The New Note will carry interest at the greater of (i) LIBOR plus 3.5%, or (ii) 5%. Because LIBOR is currently less than 1%, it is likely that the rate of interest in effect for much of the five-year term will be 5%. Deerfield will pay monthly interest on the New Note. In addition to monthly payment of interest, the Restructured Credit Documents will require yearly payments of principal in the following amounts: $150,000 in 2016; $200,000 in 2017; $400,000 in 2018; and $550,000 in 2019. These principal payments will be due on December 15 of each year (provided that the Debtor will not be in default if the payment is made by December 31).

The entire outstanding balance of the Class 1B Claim will be due and payable on December 31, 2020.

Deerfield will make additional yearly principal payments to the extent yearly wine sales exceed the financial Projections attached hereto. These payments, to the extent any payment is required, will be due in June, based on the sales for the preceding year. The first such payment would therefore be due in June 2017, for the 2016 year. The amount of the payment, to the extent such a payment is required, will be 20% of the amount by which actual sales of bottled and bulk wine exceeded Projections, as shown on Deerfield's year-end financial statements.

The obligations under the Restructured Credit Documents will be secured by all collateral currently securing the Class 1B Claim, as more specifically provided in the Restructured Credit Documents.

A further essential element of the treatment of Rabobank is the remedy available in the event of a Material Default (as defined in the Plan and the Restructured Credit Documents) on Deerfield's obligations to Rabobank. In the event of a Material Default, Rabobank will be

1   allowed to immediately obtain appointment of a liquidating trustee, who will be tasked with

2   selling the business.  In the event that a liquidating trustee is appointed, and does not successfully

3   sell the business within two years, Rabobank would be entitled to foreclose.

4        Deerfield does not anticipate circumstances that would lead it to default under the

5   Restructured Credit Documents and trigger the liquidating trustee remedy.  Should the unexpected

6   occur, however, the liquidating trustee process would halt payments to all creditors pending a sale,

7   and it is  not clear what creditors or equity holders would receive from the liquidating trust.  As

8   provided in the Plan, the liquidating trust documents would specifically task the liquidating trustee

9   with maximizing value for all creditors.

10      3.    *Class 1C (Secured Claims)*

11       Class 1C consists of all other pre-petition secured claims.  The Class 1C claims consist

12  primarily of the claims of grape growers that are secured by statutory producers liens.  The

13  principal amounts of the grower claims are being paid prior to Plan Confirmation, pursuant to the

14  Bankruptcy Court's order dated November __, 2015.

15       Pursuant to the Plan, unpaid Class 1C claims will be paid in full on or before January 31,

16  2016, with interest at a rate of 5% per year.  On payment, any and all liens secured such claims

17  will be released and discharged.

18       The unpaid Class 1C grower claims will therefore consist primarily of the right to post-

19  petition interest incurred on the claims prior to payment of the principal balance.  Class 1C is

20  impaired, and is entitled to vote.

21      4.    *Class 2 (Priority Claims)*

22       Class 2 consists of unsecured claims that are entitled to priority under the Bankruptcy

23  Code, and not otherwise classified under the Plan.  Certain claims are entitled to priority of

24  payment under the Bankruptcy Code, including some types of tax debt, and employee wage

25  claims.  As of the filing date, Deerfield had priority claim obligations to various taxing authorities

26  and to its employees.  Through "first day" orders entered shortly after the filing of the case, the

27  Bankruptcy Court approved payment of all employee wage claims, other than those of Deerfield's

28  managers.  The Bankruptcy Court also approved payment in the ordinary course of tax

000547860

Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 17 of
29

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

obligations.  As a result the remaining priority claim obligations are (1) the pre-petition wages and reimbursement claims owed to Deerfield's managers, and (2) certain disputed penalty claims asserted by the Franchise Tax Board.

Because Deerfield was generally current on its payroll, the priority claim for pre-petition wages of the managers is only the amount owed for the pay period immediately prior to filing of the petition.

The Franchise Tax Board asserts a priority claim in the amount of approximately $28,000 for certain penalties associated with the alleged failure of Deerfield to file tax returns for two years.  Deerfield believes that the returns in question were in fact timely filed, and therefore intends to object to this claim. To the extent the claim is allowed, Deerfield has sufficient cash to pay it on the Effective Date or promptly after allowance.

The Plan proposes to pay in full as of the Effective Date the allowed amount of all priority claims.  The Class 2 claims are therefore unimpaired, and not entitled to vote on the Plan.

     5.    *Class 3A (General Unsecured Claims)*

Class 3A consists of the claims of general unsecured creditors (other than certain unsecured claims of Deerfield's managers, which are treated in Class 3B).

The Plan provides for Class 3A general unsecured creditors to receive payment in full, in eight equal quarterly payments, with amortized interest, commencing April 15, 2016.  The unpaid balance of the general unsecured claims will accrue interest from and after the petition date, at 3% per year.

The Class 3A claims are impaired, and are therefore entitled to vote on the Plan.

     6.    *Class 3B (Management Unsecured Claims)*

Class 3B consists of certain unsecured claims of Deerfield's management.  These claims arise from operating loans made to Deerfield by its managing members in order to address critical cash needs of the business.  The managing members funded these loans primarily by taking out secured loans on their home.  The amount of the Class 3B claims is approximately $442,758.40.

The holders of the Class 3B claims have voluntarily agreed to receive payment on a delayed schedule, after other claims, in order to facilitate the Plan.  The Plan therefore provides

000547866

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION

that the holders of the Class 3B claims will received payment of interest only on a monthly basis from and after the Effective Date, with payment of the balance on or before January 31, 2021. The interest on the Class 3B claims shall be 3% simple interest. The Plan further provides that in no event shall the holders of the Class 3B claims receive any payment unless all other payments required under the Plan are current.

The Class 3B claims are impaired, and are therefore entitled to vote on the Plan.

7. _Class 4A (Defined Return Equity)_

Class 4A consists of certain equity interests in the Debtor which are described as "Class-A Units" in Deerfield's Operating Agreement. Deerfield has only two types of equity interests: Class-A Units and regular Units. While most of the equity in the business is in the form of regular Units, there are a limited number of Class-A Units, held by approximately twelve equity holders. The Operating Agreement provided for the holders of the Class-A Units to receive regular cash distributions. Class 4A includes both the original interests and the accrued deferred payments on account of those interests.

The Plan provides that the holders of the Class 4A Interests will retain the Class-A Units they currently own. In addition, all deferred payments to holders of Class-A Units will be converted to Class-A Units at a value of $12,500 per unit, rounded down to the nearest whole unit. The Plan provides for modification of the Operating Agreement such that Class-A Units will no longer pay dividends. Deerfield believes this is necessary in order fund the payment of creditors under the Plan.

The Operating Agreement will also provide that the Class-A Units will, post-confirmation, have a position of retirement senior to regular equity. This means that at the request of a holder of Class-A Units, the company will endeavor to sell that holder's Class-A Units to other members or potential investors in preference to regular units held by other members. This is intended to allow the holders of Class-A Units a means to liquidate their equity more quickly in the event that they wish to do so.

The specific revisions to the Operating Agreement in connection with the Plan are as set forth in the Plan.

000547864

The Class 4A Interests are impaired, and are therefore entitled to vote on the Plan.

8.    *Class 4B (Equity)*

Class 4B consists of all equity interests in the Deerfield, except those described in Class 4A.  In other words, it is all of the regular membership interests in Deerfield.

The Plan provides for all holders of Class 4B claims to retain their equity interests.  The Class 4B claims are therefore unimpaired, and not entitled to vote on the Plan.

## C.    Executory Contracts

The Bankruptcy Code classifies contracts as to which further performance is due from both sides as "executory."  Over the course of the bankruptcy case or under its plan of reorganization, a debtor must "assume" or "reject" all executory contracts.   In order to assume a contract, the debtor must cure all defaults and thereafter comply with the contract according to its terms.  If a contract is rejected, performance on both sides ordinarily terminates and the other party is entitled to assert a claim for damages, which will be treated as a general unsecured pre-bankruptcy claim; i.e., a Class 3A claim.

In this case, the Debtor does not have many material executory contracts.  Grower contracts are generally treated on a year-by-year basis.  As of confirmation, any grower contracts for the 2015 harvest year will generally not be executory, but will simply be a payment obligation of Deerfield.  To the extent that Deerfield has multi-year grower contracts, it reserves the right to add such contracts to the list of assumed contracts set forth in the Plan, or to separately file motions seeking authorization to assume.

The Operating Agreement, to the extent that it is considered an Executory Contract, will be assumed as modified by the Plan.

The Plan provides that contracts not expressly treated under the plan will be deemed rejected.  This would give rise to a claim for damages resulting from rejection; however, Deerfield believes that to the extent any contracts are rejected, the damages would not be material.

DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

000547860

## IX. IMPLEMENTATION OF THE PLAN

### A. Revesting Subject to Plan

On the Effective Date, all property will revest in the Reorganized Debtor, free and clear of claims and liens, except as specified in the Plan (which, among other things, preserves the liens of Rabobank, Sonoma County, and growers secured by agricultural producer liens). From and after the Effective Date, the Reorganized Debtor will be able to freely use or transfer its cash and assets, enforce its rights and exercise its powers, and otherwise conduct its business in its unfettered discretion, subject only to the requirements of the Plan, the Restructured Credit Documents, and otherwise applicable non-bankruptcy law.

### B. Bankruptcy Transition and Procedure

Matters subject to the Court's retained jurisdiction will be initiated and prosecuted following the Effective Date substantially in the same manner as they would be prior to the Effective Date. Notice of post-Confirmation matters will be given to the Reorganized Debtor, the US Trustee, Rabobank, and persons who request notice in writing *after* the Confirmation Date. The Creditors Committee will be dissolved as of the Effective Date, or as soon thereafter as practicable. Deerfield will file quarterly reports and continue to pay US Trustee fees after the Confirmation Date and until entry of the Final Decree.

The Plan anticipates that Deerfield will close the bankruptcy case as soon as reasonably possible after the Effective Date. The Plan also provides, however, that the Case may be reopened on the request of the holder of the Class 1B Claim for the purpose of seeking appointment of a liquidating trustee if the Reorganized Debtor defaults, as discussed with regard to the treatment of the Class 1B Claims.

### C. Management and Corporate Matters

P.J. Rex and Robert Rex will continue to be the Managing Members of the Reorganized Debtor, pursuant to its LLC operating agreement (the "Operating Agreement"). The Operating Agreement will remain in force, but will be modified by the Plan as follows:

       (a)     The sections governing "Class-A Units," will be modified as described above regarding treatment of Class 4A equity.

Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 21 of 29

(b)     Section 3.3.1 of the Operating Agreement, which governs sale of additional units, will be amended in order to allow for sale additional membership units in order to raise capital.

**D.     Objections to Claims**

The Plan provides that any person may object to a Claim treated under the Plan by filing an objection with the Bankruptcy Court and serving it on the Debtor and the claimant no later than five days before the date set for the Confirmation Hearing.  The Debtor and Reorganized Debtor may object to a Claim at any time.  If an objection is filed, the Claim will be treated as a Disputed Claim, and will not receive any distribution until the objection is resolved.

Any Claim that is not timely filed by the applicable Claims Bar Date, as defined in the Plan, will be disallowed.

Any amendment to an otherwise timely filed proof of claim must be filed on or before the Effective Date.

**E.     Co-Obligor Claims**

The Plan includes "Co-Obligor Claims" provisions, which essentially provide that a debt of the Debtor which could also be asserted as a claim against another person, such as a guarantor (a "Related Claim") shall be asserted only against the Debtor as long as the Reorganized Debtor is in compliance with the terms of the Plan.  The merits of the claim will be determined by disposition of the Related Claim, avoiding unnecessary and duplicative litigation.

If the Related Claim is Allowed, the creditor may not assert a claim based on the same debt (a "Co-Obligor Claim") against any other person (a "Co-Obligor", including officers, directors, guarantors, etc.) for a suspension period that corresponds with the term provided for payment of the Related Claim in the Plan.  If, as anticipated, the Related Claim is paid in full under the Plan, the Co-Obligor Claim will be dismissed (since it has been paid in full).

If the Related Claim is discharged or disallowed, the claimant will not be permitted to pursue the Co-Obligor Claim, thereby preventing duplicative litigation related to the same issues, and the cost of indemnity claims against the estate.  These provisions assure the claimant is

000547786

Case: 15-10150     Doc# 155     Filed: 10/30/15     Entered: 10/30/15 17:38:26     Page 22 of 29

provided a full and fair chance to recover on claims against the Debtor, but protect the Reorganized Debtor from the disruption of indemnity claims and duplicative litigation.

The premise of these provisions is that creditors are only entitled to be paid in full once, and that the Plan provides an appropriate and efficient means of paying all creditors.

**F.     Discharge**

The Plan provides for a broad discharge of all claims that are not timely asserted in the bankruptcy case, or which are asserted and disallowed by the Bankruptcy Court.  The Plan prohibits efforts to pursue collection on discharged claims.

**G.     Releases**

The Plan provides for a broad release of any and all claims or defenses that might be asserted against Rabobank and its affiliates.  As described in the Plan, the Debtor's release of Rabobank will be more fully described in the loan documents, which will be filed as a supplement to the Plan.  These releases do not extend to any obligations under the Plan.

# X.  ALTERNATIVES TO THE PROPOSED PLAN

**A.     Going Concern Sale in Chapter 11**

Deerfield believes that any sale at this time would be depressed by the event of the Chapter 11 case, and the nature of a bankruptcy sale.  Further, Deerfield believes that purchasers would value the winery based on predictable and established operating results.  Normally this requires at least a 12-month history of operations.  Although the winery has successfully operated through the bankruptcy case, and has in fact increased revenues over the prior year, operation in a Chapter 11 case inherently involves substantial extraordinary costs and business disruption.  As a consequence, a sale during bankruptcy would result in a depressed sale price that would not give full value to Deerfield's creditors and equity holders.

**B.     Liquidation**

Deerfield believes that a liquidation of its assets would be unreasonable, and entirely ineffective in realizing value for its stakeholders.  The primary asset in a liquidation would be Deerfield's real property, which could be expected to command a lower price in a liquidation

000547860

Case: 15-10150     Doc# 155     Filed: 10/30/15     Entered: 10/30/15 17:38:26     Page 23 of 29

scenario than as part of an operating and successful winery. The liquidation value of the real estate, with improvements, is estimated to be approximately $13,000,000, based on the most recent appraisal.[7] The liquidation value of all other assets is estimated to be approximately $4,470,000, of which $370,000 is estimated cash on hand.

The amount that might be recovered from Deerfield's non-real estate assets in a Chapter 7 liquidation is highly uncertain, at best. A substantial part of the non-real estate value of Deerfield is its wine inventory. In a Chapter 7 liquidation, much of the value of this inventory would be lost, because wine has substantially less value when sold outside the ordinary course. Deerfield's estimate of the liquidation value of its assets is shown in summary attached hereto as **Exhibit B**.

Based on Deerfield's best estimates, it is likely that a Chapter 7 liquidation would result in sufficient funds to pay a substantial part, or all, of the unsecured debt. There is, however, substantial uncertainty. The liquidation values shown above would have to be discounted by the costs of sale and the costs of Chapter 7 administration, both of which could be substantial. The cessation of operations in a Chapter 7 would also significantly increase claims, and some of these claims would be for post-petition obligations and therefore entitled to administrative priority.

It is also uncertain when unsecured creditors might be paid in a Chapter 7 liquidation. Sale of the real property and other assets would likely require a substantial marketing period of three to six months. Including other issues of administration, Deerfield estimates that it would be between nine and twelve months before unsecured creditors would receive any payment in a liquidation, and there is a significant chance the time would be longer.

Deerfield believes that a Chapter 7 liquidation would involve substantial uncertainty for unsecured creditors. Further, even to the extent it did result in full payment, it would not be a more favorable result that the payment in full with interest provided by the Plan.

---

[7] Deerfield believes the fair market value as part of the operating winery is considerably higher, based on market conditions, comparable transactions, and recent indications from potential buyers and investors. Nevertheless, in estimating liquidation value, Deerfield believes the most recent appraisal is appropriate.

DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

000547866

In addition, a Chapter 7 liquidation would likely return very little, if anything, to equity holders. Deerfield believes that the ownership interests retained by equity holders under the Plan are of greater value than any minimal, and highly speculative, amounts that might be paid to equity in a litigation.

## C.   Non-Consensual Plan

The other alternative to the Plan would be a non-consensual plan, with regards to the treatment of Rabobank. The most substantial benefit that might be obtained in a non-consensual plan would be a deferred maturity date. It is highly uncertain, however, whether Deerfield would be able to obtain confirmation of a plan that deferred the maturity date substantially longer than the five years provided by the Plan. A non-consensual plan might also provide for a reduced interest rate or lower payments of principal, but it is again highly uncertain whether these results could be obtained.

The Plan also provides for fixing the Rabobank claim at $11,750,000, inclusive of pre-confirmation interest, fees and charges, attorneys' fees, and any other amounts. It is possible in a non-consensual plan that the total allowable amount of Rabobank's claim might be determined to be a smaller amount. It is unlikely, however, that the amount would be found to be substantially lower, and there is a significant likelihood that the allowable amount would be higher, especially considering additional fees that would be incurred by Rabobank's counsel and added to the amount of its claim in connection with a contested plan.

Finally to the extent that Deerfield had colorable claims against Rabobank, those would be preserved. Deerfield believes, however, that prosecution of any claims against Rabobank would be unrealistic in terms of likelihood of success and cost.

Rabobank would likely object vigorously to any non-consensual plan, and there can be no certainty that Deerfield would prevail. Regardless, Deerfield believes that the costs would almost certainly exceed any benefit.

**D.**     **Conclusion**

For the reasons presented above, Deerfield does not believe that any of the available alternatives represent a preferable alternative to confirmation of the Plan for Creditors or equity holders.

## XI.  OTHER ISSUES

**A.**     **Feasibility of the Plan**

The Bankruptcy Code requires that Deerfield demonstrate that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Deerfield believes that it will be able to perform all of its obligations under the Plan in a timely manner, and that the Plan is therefore feasible.

A summary of Deerfield's updated financial Projections through 2020 are attached hereto. Although the Projections are subject to various assumptions and risk factors, Deerfield believes that they are reasonable and achievable.  Deerfield has endeavored to be conservative with regard to the assumptions that inform the Projections.  In order to be conservative, Deerfield used what it believes to be at the bottom end of the range of reasonable estimated revenue growth.

Based on these Projections, Deerfield believes that the payments provided in the Plan are feasible.  The Projections reflect the ability to make all payments required under the plan, through the term of the New Note, from operating cash flows.  The final balance due to Rabobank at the maturity date of the New Note is estimated to be approximately $10,450,000.  The Projections reflect that, after available funds from operations at the end of 2020, a total of approximately $9,665,017, will need to be raised to pay off the loan balance to Rabobank, as shown in the lower left corner of the Cash Flow Analytics on page two of the Projections.  It is Deerfield's expectation that this amount can reasonably be raised through a refinance or sale of the business, prior to the maturity date.

The Projections are subject to a number of qualifications and assumptions, as set forth in the footnotes to the Projections.  The Projections should be read in conjunction with these

000547866    Case: 15-10150    Doc# 155    Filed: 10/30/15    Entered: 10/30/15 17:38:26    Page 26 of 29

assumptions and qualifications, as well as the risk factors set forth in this Disclosure Statement, as they may affect the financial feasibility of the Plan.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS IN VOTING CLASSES TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR BY ANY OTHER ENTITY OR FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS, SECURITIES OR EQUITY INTERESTS IN DEERFIELD OR THE REORGANIZED DEBTORS.

MANY FACTORS COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE REORGANIZED DEBTOR TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS THAT MAY BE EXPRESSED OR IMPLIED BY THE PROJECTIONS.  SHOULD ONE OR MORE OF THESE RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD ANY ASSUMPTIONS UNDERLYING THE PROJECTIONS PROVE INCORRECT, ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SET FORTH IN THE PROJECTIONS.  DEERFIELD DOES NOT INTEND, AND DOES NOT ASSUME ANY DUTY OR OBLIGATION, TO UPDATE OR REVISE THE PROJECTIONS, WHETHER AS THE RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS OTHERWISE REQUIRED BY LAW.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH GAAP.  THE PROJECTIONS HAVE  NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT AUDITORS OR ACCOUNTANTS.

000547360

**B.       Risk Factors**

There are a number of risk factors to be considered in weighing the prospect that Deerfield will successfully complete its payments under the Plan.  In addition to the risks inherently associated with any business, the following factors should be considered.

First, Deerfield could default on obligations to Rabobank prior to the date provided for final payment of unsecured creditors.  In that event, Rabobank could exercise its rights to require a appointment of a liquidating trustee.  This would likely halt payments to all creditors pending completion of a sale by the liquidating trustee.  If the liquidating trustee failed to sell the business, it could lead to foreclosure by Rabobank.

Second, Deerfield's business is very closely tied to the success of the California wine industry as a whole.  In recent years, the California wine industry has experienced a substantial overall upward trend, which is likely tied to the overall economic recovery.  Were general economic conditions to deteriorate substantially, Deerfield's ability to perform under the Plan would be less certain.

Third, Deerfield is an agricultural business, and therefore could be susceptible to climate or other conditions affecting grape production in the region.

**C.       Tax Consequences**

This Disclosure Statement does not purport to provide tax advice.  Creditors and equity holders should consult their own tax advisors regarding any questions as to tax implications of the Plan.  The following statement is intended only to provide a general discussion for the purposes of evaluating the Plan, but should not be relied upon as definitive for any particular person.

It is Deerfield's best estimate that confirmation of the Plan will generally be tax neutral for creditors and the Debtor.

1.       *Tax Treatment of Creditors*

All creditors are to be paid in full under the Plan.  The payments to be made under the Plan will therefore likely have the same tax attributes they would have had if timely paid outside the bankruptcy case, except for changes regarding timing of payment.  To the extent that creditors holding claims against Deerfield are cash-basis tax payers, the distributions from Deerfield will

000547866   Case: 15-10150   Doc# 155   Filed: 10/30/15   Entered: 10/30/15 17:38:26   Page 28 of
29

most likely constitute income in the year received, as opposed to the year in which they were due to be received. To the extent that creditors are accrual-basis tax payers and have written off their claims against Deerfield, the distributions under the Plan will likely constitute taxable income. To the extent that creditors holding claims against Deerfield are accrual-basis tax payers and paid taxes on their claims against Deerfield in the year that payment was due, the distributions from Deerfield will likely not constitute taxable income in the year received.

2. _Tax Treatment of Equity Holders_

Equity holders will retain their limited liability company membership interests in the Deerfield. Deerfield therefore expects that confirmation of the Plan will be largely tax neutral for equity holders, although they are strongly advised to contact their own tax advisors. With regard to holders of "Class-A Membership Units," there may be some tax consequences associated with the conversion of the accrued obligations to additional membership units.


# XII. **CONCLUSION**

As a result of its current operating profitability, Deerfield believes that the Plan will pay all unsecured Creditors in full within approximately two years, with interest. The Plan also preserves the ownership interests and value of the business for its equity holders. Deerfield urges all creditors and equity holders to vote in favor of the Plan.


DATED: October 30, 2015          MCNUTT LAW GROUP LLP


By: _____/s/ Shane J. Moses_____
        Shane J. Moses
        Attorneys for DEBTOR

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF REORGANIZATION